(No. 33190.— )

ROBERT D. WHITELAW, Appellee, *vs.* WILLIAM N. BRADY, Exr., *et al.,* Appellants.

*Opinion filed September 23, 1954.*

EUGENE P. MEEGAN, of Chicago, for appellants.

HETH, LISTER & FLYNN, of Chicago, (EMMETT J. GALVIN, of counsel,) for appellee.

Mr. JUSTICE FULTON delivered the opinion of the court:

This is an appeal from a decree for specific performance entered by the superior court of Cook County.

Robert D. Whitelaw, the appellee, filed complaint for specific performance based upon a written instrument which reads as follows:

> "Option of purchasing the property of F. S. Ramm located at 1006 No. Leamington Ave.
> Purchase price of $10,500
> Down payment of 2,500 or $3,000
> Balance to be paid in monthly installments of $75.00
> In case of Mr. Ramm's death the balance to be paid to Mr. Ramm's estate at no interest
> In consideration for the above Mr. Ramm will live rent free for the rest of his life at the above address
> If desired payments of $75.00 per month will begin ————— these payments to apply on the purchase price of the property. Also that said property can not be re-sold without the consent of Mr. Ramm
>
> [Signed] F. S. Ramm."

The appellants are the executor of the estate of Fred S. Ramm, deceased, and the beneficiaries and their spouses under his last will and testament. These appellants filed answer in which they denied that Ramm had entered into an agreement in writing with appellee to sell his property located in the city of Chicago and further denied that the appellee had tendered performance on his part under such agreement. A counterclaim was also filed by them asking for judgment against appellee for rent at the rate of $40 per month from the date of Ramm's death and also for damages on account of alleged interference of appellee in their attempts to rent the lower apartment of said premises. Answer having been made to the counterclaim, issue was joined on the pleadings.

The appellee, Whitelaw, had previously secured an order in the probate court of Cook County, directing that Brady, as executor of Ramm's estate, file a petition in that court for leave to convey the property involved to Whitelaw.

From that order Brady appealed to the superior court, and the appeal and the suit for specific performance were consolidated. The matter was thereafter referred to a master in chancery to take testimony and report his findings and conclusions. The master recommended that a decree for specific performance be entered and that the counterclaim of the appellants be dismissed. Objections of the appellants to the report were overruled and thereafter renewed as exceptions thereto. On December 4, 1953, a decree was entered overruling appellants' exceptions and directing appellants to convey the real estate in question to appellee upon payment to them of $10,151.48, which amount represented the purchase price of $10,500 less the sum of $300 owed by Fred S. Hamm, deceased, to the appellee, "which was represented by note of said decedent held by appellee used to bind the contract," and less $48.52, being appellee's costs taxed against the appellants. The decree further ordered that, in the event of appellants' failure to so convey within thirty days, the master in chancery was appointed to deliver a master's deed to appellee upon payment to the clerk of the amount fixed by the court. The counterclaim was dismissed for want of equity. From this order appellants have appealed to this court.

The errors relied upon are that the court erred in sustaining the master's report, which found that a valid contract had been entered into, that the instrument sued on was in compliance with the Statute of Frauds, and that the equities were with the appellee, and in entering a decree for specific performance and dismissing the counterclaim of appellants. The primary issue involved is the nature of the instrument sued upon. Appellants contend that it was an option which the appellee, Whitelaw, had accepted and agreed to perform but that he had failed to exercise his election thereunder in strict compliance with its terms. Appellee contends that the instrument, though captioned an option, was merely a continuing offer, and that it was

orally accepted by the appellee during Ramm's lifetime and thereupon became a mutual, binding contract of sale.

In order to construe the legal nature of the writing, it is necessary to consider it in the light of the circumstances under which it was created. The evidence shows that Ramm, a widower, owned a two-story frame building located at 1006 North Leamington Avenue, Chicago, where he occupied the first-floor apartment and the appellee, Whitelaw, the second-floor apartment as his tenant for approximately four years. In March, 1950, Ramm was hospitalized. Following his return to his home he spent considerable time in the apartment of the appellee and his wife and partook many meals with them. During the summer of 1950 negotiations took place between Whitelaw and Ramm regarding the purchase of the premises in question. In July or August of that year Whitelaw submitted to Ramm a draft of an option to buy the building, which read as follows:

"Option of purchasing the property of F. S. Ramm
1006 No. Leamington Ave. within one year.
Purchase price of $10,500
Purchase price of $10,500
Down payment of $2500 or $3000.
Balance to be paid in monthly installments of $60.00 with the option of doubling payments whenever possible.
This balance to be carried by Mr. F. S. Ramm or his estate at no interest.
In consideration for the above Mr. Ramm will live rent free for the rest of his life.
Within the time of the option any necessary major repairs needed if paid by us with the consent of Mr. Ramm will be deducted from the purchase price.
If desired payments of $60.00 per month will start Jan. 1st 1951 these payments to apply on the purchase price of the house.

R D Whitelaw."

Thereafter Ramm prepared in his own handwriting the instrument which is the subject matter of this suit. The illness from which Ramm was suffering was, sometime

during this period, discovered to be cancer and was apparently known to both Whitelaw and Ramm by the manner in which they made provision for his death in the documents respectively prepared by them.

By the testimony of witnesses before the master in chancery, appellee offered to prove delivery of the instrument penned by Ramm and the oral acceptance thereof. Augusta Stannard testified that shortly before Christmas, 1950, Ramm took the document out of an envelope and showed it to her, saying it was to be a contract for the Whitelaws. Across the face of the envelope was written in the handwriting of Ramm, "Mr. R. D. Whitelaw." This envelope was also offered and received in evidence. About a week later she again saw Ramm and at that time he told her he had given the document to the Whitelaws and that they would be the new owners as of March 1.

Two persons present at a dinner in the Whitelaw apartment in the early part of January, 1951, testified to the effect that Ramm stated he was going down to fix the furnace and that was a job he would not have to do much longer because he had offered the building for sale to Whitelaw and he expected in the very near future Whitelaw would be the new landlord. One of these persons said Whitelaw acknowledged that he and Ramm had agreed on the sale and that he would be buying the building.

A nephew of Mrs. Whitelaw testified that in the middle of January, 1951, he inquired of Whitelaw as to the situation in regards to the house. Whitelaw replied that he had accepted Ramm's offer and was to pay $10,500 with $2,500 as a down payment and the balance in monthly payments of $75, commencing March 1, 1951. Ramm, who was present, remarked that that was correct and that Whitelaw had inherited the janitor duties of the landlord and would in the future care for the flower beds, grass, etc. This was, in brief, all the testimony offered by appellee to show an alleged oral acceptance by him.

Whitelaw and Brady were called as witnesses for the defense. Whitelaw stated that he first saw Ramm's proposal on December 23, 1950, when his wife handed it to him after he came home from work. On February 19, 1951, the date of Ramm's death, Whitelaw went to Brady's office, who was the attorney for Ramm, showed him the document and inquired whether or not he would be safe in doing certain work on the house. He claims he told Brady he had orally accepted Ramm's proposition, the down payment to be $2500 and $75 to be paid monthly, using a note of Ramm's as a binder. He further stated that Brady told him how to accept the proposal. Attorney Brady testified he advised Whitelaw he had no contract because it was not accepted but denies he told him how to accept the proposal or that Whitelaw had told him he had orally accepted it. In the afternoon of that day, Whitelaw returned to his apartment and inserted with a typewriter the figures, "3/1/51" in the blank space in Ramm's proposal and added the following:

"12/26/51
I hereby accept the above terms for the purchase of Mr. F. S. Ramms property and will pay upon demand the down payment desired meanwhile to make this sale binding the attached note of Mr. Ramms will serve as part of the downpayment as long as the sale is completed and will be canceled, otherwise the note will be reinstated.

[Signed] Robert D. Whitelaw."

Ramm died at 9:30 P.M. that day. At some later date Whitelaw changed the date of his acceptance to read "12/26/50," the day the oral acceptance is said to have been made. It is undisputed that Ramm never saw the typewritten additions to the document and it is admitted Whitelaw never paid any money to Ramm.

Option contracts have been repeatedly defined by the decisions of this court. An option contract is one by which the owner of property agrees with another person that the

latter shall have the right to buy the former's property at a fixed price within a certain time. The owner does not then sell his land or any interest in it, or agree to sell, but he does sell the right or privilege to buy at the option of the other party. The second party gets, *in praesenti,* not lands or an interest therein or an agreement that he shall have lands, but the right to call for and receive lands if he so decides. (*Keogh* v. *Peck,* 316 Ill. 318; *Mitzlaff* v. *Midland Lumber Co.* 338 Ill. 575.) An option contract is an executed unilateral contract, and not an executory one. Yet the provisions of the same may be made bilateral and executory at any time during the life of the contract. (*In re Estate of Frayser,* 401 Ill. 364.) An option is a right acquired by contract to accept or reject a present offer within the time limited. In such contract two elements exist: first, the offer to sell, which does not become a contract until accepted; second, a contract to leave the offer open for a specified time. (*Morris* v. *Goldthorp,* 390 Ill. 186.) It is clearly apparent that an option is a contract and must, therefore, necessarily contain all the incidents of a contract, among them being the requirement of the existence of a valuable consideration. (*Owens* v. *Green,* 400 Ill. 380; *Keefer* v. *United Electric Coal Companies,* 292 Ill. App. 36.) The so-called option in this case does not specify a time for performance by the optionee, nor was any consideration given for it. We are of the opinion, therefore, that the instrument sued upon was not an option but was more in the nature of a unilateral offer.

The instrument being but an offer, the question then remains whether or not it was orally accepted by Whitelaw so as to become a mutual, bilateral contract. It is elementary that in order to constitute a contract by offer and acceptance, the acceptance must conform exactly to the offer. (*Snow* v. *Schulman,* 352 Ill. 63.) The very nature of Ramm's proposal in this case was not, however, conducive to an unqualified "yes" or "no" acceptance. Alterna-

tive amounts for down payment are specified and the time for commencement of the monthly payments was not stated. It is not unusual, however, for negotiations for a contract on any subject matter to be a series of proposals and counterproposals each narrowing the differences between the parties on certain matters and leaving open others for future determination. Obviously Ramm's proposal is closely patterned after the one submitted to him by Whitelaw. If by his acceptance appellee had only to signify his choice between a down payment of $2500 or $3000, and having elected to pay the smaller amount, we feel his acceptance would have been sufficient to create a bilateral contract. However, time for performance having been left open, we do not believe that it was Ramm's intention that the time for the commencement of monthly payments should be left entirely within Whitelaw's discretion, especially in view of the protracted illness of which Ramm suffered. Appellee argues that, time having been unmentioned, performance should commence within a reasonable time. While this may be the rule in some instances, under the circumstances of this case time was a material and essential element of the final agreement, and it cannot be said that Ramm intended payments should begin at a time to be designated by the offeree and then only "if desired." These propositions are aptly stated in Selections from Williston on Contracts, Revised Edition (1938), at page 42: "It is a necessary requirement in the nature of things that an agreement in order to be binding must be sufficiently definite to enable a court to give it an exact meaning. If an offer contemplates an acceptance by merely an affirmative answer, the offer itself must contain all the terms necessary for the required definiteness. An offer may, however, contain a choice of terms submitted to the offeree from which he is to make a selection in his acceptance. Such an offer is necessarily indefinite but, if accepted in the way contemplated, the ultimate agreement of the parties

is made definite by the acceptance. A lack of definiteness in an agreement may concern the time of performance, the price to be paid, work to be done, property to be transferred, or miscellaneous stipulations in the agreement."

By allowing the testimony every reasonable presumption to which it is entitled, it becomes apparent that Ramm's proposal not only left open for future determination certain elements of the contract but that the parties did, in fact, resolve these matters between December 23, 1950, and December 26, 1950, by parol agreement; namely, the matter of the amount of the down payment, the time for commencement of monthly payments and the use of a note signed by Ramm as a binder for the agreement. Nowhere in the written offer is mention made that the plaintiff is to submit such a binder as evidence of his good faith. This factor is expressly mentioned, however, in the adjudication portion of the decree for specific performance which purports to enforce the contract between the parties. Moreover, the appellee in his testimony before the master stated that two or three times Ramm had made appointments with attorney Brady to have their agreement "drawn in legal form" but was deterred from doing so because of inclement weather and his ill-health. This testimony is further indication of the fact that the parties had reached a final meeting of the minds by parol agreement, which they intended to have reduced to writing.

The attempt on the part of the appellee to produce the agreement in written form by making a typewritten endorsement on Ramm's proposal on February 19, 1951, was ineffectual in removing it from the prohibition of the Statute of Frauds. The additional writing was never seen by Ramm and was not thereafter signed by him. It is the conclusion of this court, therefore, that Ramm's proposal in writing contemplated further negotiations and was in fact thereafter modified by parol agreement; and that the final agreement of the parties, not being reduced to writing

592

and signed by the party sought to be charged, was repugnant to the Statute of Frauds and incapable of specific enforcement.

Because of the reasons herein stated, it is unnecessary to consider all of the arguments advanced by the appellants. No evidence was offered to sustain the allegations of the counterclaim, and no objections were made to the master's recommendation that it be dismissed. The decree of the lower court properly dismissed the same and that part of the decree is affirmed. That portion of the decree ordering specific performance is reversed. The order of the probate court of Cook County directing the executor, Brady, to file petition for leave to execute a deed to the appellee is also reversed.

*Affirmed in part, and reversed in part.*